SUPERIOR COURT 
 
 HAROLD PARSONS, ON BEHALF OF HIMSELF AND OTHERS SIMILARLY SITUATED v. THE COMMERCE INSURANCE COMPANY

 
 Docket:
 2084CV00659-BLS2
 
 
 Dates:
 June 17, 2025
 
 
 Present:
 Kenneth W. Salinger
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 DECISION AND ORDER DENYING PLAINTIFF’S MOTION FOR CLASS CERTIFICATION
 
 

 Harold Parsons was involved in a motor vehicle collision. Commerce Insurance Company insured his vehicle and deemed it to be a total loss. Parsons was therefore entitled under his insurance policy to recover the actual cash value (“ACV”) of his vehicle from Commerce, taking into account the vehicle’s age and condition before the collision. Parsons claims that Commerce offered to pay him far less than ACV, and that Commerce breached its contractual obligations and also violated G.L. c. 93A, § 9, in doing so.
Parsons contends that Commerce violated c. 93A in two ways: (1) by using a Market Valuation Report (“MVR”) provided by CCC Intelligent Solutions that allegedly reduced its ACV estimate; and (2) by ignoring the price that that Parson’s father paid for the vehicle when determining ACV.
Parsons has moved to certify two classes, one for each theory of liability on the c. 93A claim. Though Parsons does not say so clearly, it appears that he is not seeking class certification as to the breach of contract claims.[1]
The Court finds that individualized inquiry would be required for each member of the proposed classes to determine whether Commerce paid or offered to pay them less than their vehicle’s ACV, and thus to determine whether Commerce is liable to that class member for violating G.L. c. 93A. In the exercise of its discretion, the Court will deny the motion for class certification because the proposed class members are not similarly situated and
 
--------------------------------------------
 
[1] In his memorandum, Parsons says that he does not need to satisfy the predominance and superiority requirements of Mass. R. Civ. P. 23(b), which is true only with respect to his Chapter 93A claim. Commerce noted in its opposition that Parsons was moving for class certification only on the c. 93A claim. Parsons did not disagree, either in his reply or at oral argument.
 
                                                            -1-
have not suffered similar injuries, individual issues predominate over common ones, and a class action would not be superior to other methods of litigation.
1. Legal and Factual Background. The following background informs the Court’s exercise of its discretion as to whether the certify the proposed classes.
1.1. Actual Cash Value Regulations. The 2016 edition of the standard Massachusetts auto insurance policy provides in part 7 that, if the insured has purchased collision coverage and the vehicle suffers damage caused by a collision, then the insurer will pay either the cost to physically repair the vehicle or the ACV of the vehicle, whichever is less. See, e.g., Puopolo v. Commerce Ins. Co., No. 21-P-718, 2022 WL 1217215, at *1 n.7 (Mass. App. Ct. April 26, 2022).[2] “The 2008 policy contains substantially similar language.” Id.
A Massachusetts auto insurer may deem a damaged vehicle to be a “total loss” if it determines that “the appraised cost of repair plus the estimated salvage may be reasonably expected to exceed the actual cash value  of  a  vehicle.” 212 C.M.R. § 2.04(f).
If those conditions are met, meaning whenever the appraised cost of repair plus estimated salvage value may reasonably be expected to exceed actual cash value, “the insurer shall determine the vehicle’s actual cash value” (“ACV”) by considering “all the following factors:
(a)        the retail book value for a motor vehicle of like kind and quality, but for the damage incurred;
(b)       the price paid for the vehicle plus the value of prior improvements to the motor vehicle at the time of the accident, less appropriate depreciation;
(c)        the decrease in value of the motor vehicle resulting from prior unrelated damage which is detected by the appraiser; and
(d)       the actual cost of purchase of an available motor vehicle of like kind and quality but for the damage sustained.”
211 C.M.R. § 133.05(1).
1.2. Adjustment of Parsons’ Claim. In June 2018, Mr. Parsons was involved in a motor vehicle collision while driving his 2014 Ford Focus SE, which was
 
--------------------------------------------
 
[2]        The complete standard policy is available at
 https://www.aib.org/contentpages/public/Policy.aspx.
 
                                                            -2-
 
insured under a standard Massachusetts auto policy  issued  by  Commerce. A Commerce adjuster deemed the vehicle to be a total loss.
Parson’s father had purchased the vehicle the year before for $10,500 when it had 4,709 miles on the odometer. At the time of the collision, the vehicle had 18,672 miles on its odometer.
A Commerce adjuster offered to pay Parsons $10,258 to settle his ACV claim. Parson’s father made counteroffers of $15,141.88 and $14,355.94.
1.3. Commerce’s Valuation Process. Commerce begins the process of resolving collision claims by having a licensed appraiser inspect the vehicle to evaluate its pre-collision condition. The appraiser inspects and rates eleven components of each vehicle (engine, transmission, body, paint, glass, front tires, rear tires, dashboard, carpet, headliner, and seats) using one of four possible ratings (major wear, normal wear, dealer ready, and exceptional).
In most cases the appraiser submits their evaluation to CCC, which prepares a Market Valuation Report for Commerce. The MVR includes two estimates of ACV, a CCC value determined using CCC’s valuation methodology and a NADA value obtained from the National Automobile Dealer’s Association. The CCC value is often but not always lower than the NADA value.
The adjuster uses the information in the MVR to prepare and make an offer to the insured. An insured who has made a collision claim may try to negotiate a higher amount. Commerce typically does not provide the insured with copies of the MVR or any other information considered by Commerce unless the insured asks for it.
1.4. CCC’s Valuation Methodology. CCC maintains a database of market prices for high-quality used cars. It obtains that information from dealerships, print and private advertisements, online marketplaces, and physical inspections of used car dealership inventory. Each database entry includes either the list price or the “take price” for that vehicle; the “take price” is used only if a dealership has told a CCC representative the price that the dealer is willing to accept for that vehicle.
To prepare an MVR for a particular vehicle, CCC begins by identifying comparable vehicles in its database. Where comparable vehicles were being sold at a private sale, CCC deems their condition to be “Normal Wear.” Where comparable vehicles were instead being sold at a dealership, CCC applies a downward “condition adjustment” to account for the typical difference in
 
                                                            -3-
 
condition between a used vehicle that has been refurbished and sold by a dealer in “Retail” condition and used vehicles sold in Normal Wear condition. Adjustments for other factors such as options and mileage are done separately; as a result, CCC applies a uniform “condition adjustment” to each comparable vehicle being sold at a dealership for any particular MVR.
Once CCC has estimated the average ACV of a comparable vehicle in Normal Wear condition in this manner, it will make further condition adjustments to that figure based on the appraiser’s valuation of the loss vehicle’s components. To the extent the insured’s vehicle’s components were in better condition than the Normal Wear baseline, CCC will apply positive adjustments that increases its estimate of ACV. But to the extent that the loss vehicle had components that were in the “Major Wear” category, CCC will apply negative adjustments that reduce its estimate of ACV.
In Parsons’ MVR, all of his vehicle components were determined to be in Normal Wear condition except for his tires, where were in Retail condition. As a result, CCC applied a positive condition adjustment at the second stage of its analysis to reflect that Parsons’ tires were in better than normal condition.
The parties seem to dispute the extent to which CCC adjusts the NADA value when it prepares an MVR. Commerce says that before June 2018 the MVRs reported an average of the CCC and NADA values, but since then the CCC and NADA values are reported separately and Commerce no longer applies CCC’s dealer condition adjustments to adjust the NADA value. Parsons contends that since June 2018 Commerce has continued to apply the CCC negative dealer condition adjustment to the NADA retail book value when calculating ACV.
2. Proposed Class Definitions. Parsons has asked the Court to certify the following classes, using the following proposed definitions:
Condition Adjustment Class: All individuals covered under a Commerce standard form Massachusetts automobile insurance policy who, from four years prior to the filing of the Complaint [i.e., from March 9, 2016] to the date of judgment, received a total loss payment based in whole or in part (1) in reliance on the CCC database of vehicles, and (2) on a CCC report in which the reported priced of comparable vehicles and/or the retail book value of the vehicle was reduced by a “dealer ready condition adjustment.”
Price Paid Class: All individuals covered under a Commerce standard form Massachusetts automobile insurance policy who, from four years
 
                                                            -4-
 
prior to the filing of the Complaint [i.e., from March 9, 2016] to the date of judgment, received a total loss payment where Commerce failed to consider the price paid for the loss vehicle plus the value of prior improvements to the vehicle at the time of the accident, less appropriate depreciation in determining the actual cash value of the loss vehicle.
3. Class Certification Standards under Chapter 93A, § 9. A judge has broad discretion to grant or deny class certification under G.L. c. 93A, § 9(2), as to a claim that the defendant engaged in unfair or deceptive business practices that allegedly harmed individual consumers who are not themselves engaged in trade or commerce. See Moelis v. Berkshire Life Inc. Co., 451 Mass. 483, 489 (2008); Fletcher v. Cape Cod Gas Co., 394 Mass. 595, 606–607 (1985); Morgan v. Massachusetts Homeland Ins. Co., 91 Mass. App. Ct. 1, 6 (2017).
Certification of a class action with respect to claims under G.L. c. 93A, § 9, is permitted if the plaintiffs can show that they are seeking “relief for an unfair or deceptive act or practice,” and “that the act or practice ‘caused similar injury to numerous other persons similarly situated.’ ” Morgan, , 91 Mass. App. Ct. at 5, quoting G.L. c. 93A, § 9(2).
In addition, § 9(2) "requires satisfaction of the same elements of numerosity, commonality, typicality, and adequacy of representation as are required by Mass. R. Civ. P. 23(a).” Moelis, 451 Mass. at 489.
“Unlike rule 23, however, § 9(2) does not require that common issues predominate over individual ones, or that a class action be superior to other methods of litigation,” as is required under Rule 23(b) in cases not brought under c. 93A. Id. at 489–490. A court nonetheless “has discretion to consider issues of predominance and superiority” in deciding whether to certify a class claim under c. 93A. Id. at 490.
“[A] party moving for class certification need only provide ‘information sufficient to enable the motion judge to form a reasonable judgment’ that certification requirements are met.” Aspinall, 442 Mass. at 391–392, quoting Weld v. Glaxo Wellcome Inc., 434 Mass. 81, 87 (2001). Whether Plaintiffs can ultimately prevail is not a relevant consideration in deciding whether class certification is appropriate. See Weld, 434 Mass. at 85 (it would be an abuse of discretion to deny class status “by imposing, at the certification stage, the burden of proof that will be required of the plaintiffs at trial”). “[N]either the possibility that a plaintiff will be unable to prove his allegations, nor the
 
                                                            -5-
possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies the Rule.”  Salvas  v.  Wal-Mart  Stores,  Inc., 452 Mass. 337, 363 (2008), quoting Weld, supra, at 87.
“[W]hen the judge is deciding a certification request under § 9(2), the judge must bear in mind [that there is] ‘ “a pressing need for an effective private remedy” for consumers, and that “traditional technicalities are not to be read into the statute in such a way as to impede the accomplishment of substantial justice.” ’ ” Aspinall v. Philip Morris Cos. Inc., 442 Mass. 381, 391–392 (2004), quoting Fletcher, 394 Mass. at 605. “The right to a class action in a consumer protection case is of particular importance where, as here, aggregation of small claims is likely the only realistic option for pursuing a claim.” Feeney v. Dell Inc., 454 Mass. 192, 202 (2009).
Nonetheless, a judge may deny class certification as to consumer claims under c. 93A, § 9(2), where the standards for certification are not met. See, e.g., Bellermann v. Fitchburg Gas & Elec. Light Co., 470 Mass. 43, 54–59 (2014) (“Bellermann I”) (affirming denial of class certification); Morgan, , 91 Mass. App. Ct. at 5 (same). Indeed, a judge may reasonably exercise their discretion to find that proposed class members are not “similarly situated” and have not suffered a “similar injury,” as required for class certification under § 9(2), even if the judge concludes that the Rule 23(a) commonality and typicality requirements have been satisfied. See Fletcher, 394 Mass. at 605–607 (Superior Court judge did not err in denying class certification under § 9[2]).
4. Findings and Analysis. The Court finds that the proposed classes would satisfy the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation. As for numerosity, the proposed Condition Adjustment Class would probably have at least 75,000 members, and the proposed Purchase Price Class would provable have over 100,000 members. This easily satisfies the numerosity requirement. [3] As for commonality and typicality, all putative class members would assert the same theories of liability and seek the same general kind of damages based on the same alleged conduct
 
--------------------------------------------
 
[3] See Gammella v. P.F. Chang’s China Bistro, Inc., 482 Mass. 1, 12 (2019) (reversible error to deny class certification for lack of numerosity where class included “hundreds of employees”); Layes v. RHP Properties, Inc., 95 Mass. App. Ct. 804, 823 (2019). (“a class of 240 members is sufficiently numerous to qualify for class treatment”).
 
                                                            -6-
 
by Commerce.[4] And as for adequacy of representation, the interests of Mr. Parsons are aligned with those of the other putative class members, and plaintiff’s counsel is well qualified to conduct the litigation on behalf of the proposed class members.
The Court finds, however, that the proposed classes would not meet the requirements under G.L. c. 93A, § 9(2), that class members be similarly situated and have suffered similar injuries. Nor would the proposed classes meet the Rule 23(b) standards of predominance and superiority. And the Court also concludes that the failure to show predominance and superiority weigh heavily against certifying classes as to the c. 93A claim in this case.
4.1. Need for Individualized Determination of Liability. The class members are not “similarly situated” and may not have suffered “similar injury,” and therefore class certification is inappropriate under G.L. c. 93A, § 9(2), because “the beneficial or detrimental effect of the use of the CCC reports in determining even the original offer would depend on each putative class member's particular circumstance.” Morgan, 91 Mass. App. Ct. at 6–7 (affirming denial of class certification in prior lawsuit challenging insurer’s use of CCC’s database to determine ACV of damaged motor vehicles).
There is no way to tell whether Commerce paid or offered to pay any putative class member an amount below the ACV of their damaged vehicle without conducting an individualized inquiry into the pre-collision condition of their vehicle and the market value of comparable vehicles of like kind and quality.
 
--------------------------------------------
 
[4] The commonality requirement is met when the class members “have a common interest in the subject-matter of the suit” that “arise[s] out of a common relationship to a definite wrong.” Godfrey v. Massachusetts Med. Serv., 359 Mass. 610, 620 (1971), quoting Spear v. H.V. Greene Co., 246 Mass. 259, 266 (1923). “Typicality is established when there is ‘a sufficient relationship … between the injury to the named plaintiff and the conduct affecting the class,’ and the claims of the named plaintiff[s] and those of the class ‘are based on the same legal theory.’ ” Weld, 434 Mass. at 87, quoting 1 H. Newberg, Class Actions § 3.13, at 3–76 (3d ed. 1992). “A plaintiff representative normally satisfies the typicality requirement with ‘an allegation that the defendant acted consistently toward the [representative and the] members of a putative class” (bracketed material in original). Id., quoting Fletcher, 394 Mass. at 606.
 
                                                            -7-
 
As the United States Court of Appeals for the Ninth Circuit noted, in affirming denial of class certification in a very similar case challenging an insurer’s use of CCC’s software to estimate actual cash value of damage automobiles:
Because [the insurer] only owed each putative class member the actual cash value of his or her car, if a putative class member was given that amount or more, then he or she cannot win on the merits. But figuring out whether each individual putative class member was harmed would involve an inquiry specific to that person. More particularly, it would involve looking into the actual pre-accident value of the car and then comparing that with what each person was offered, to see if the offer was less than the actual value. Because this would be an involved inquiry for each person, common questions do not predominate.
Lara v. First Nat'l Ins. Co. of America, 25 F.4th 1134, 1139 (9th Cir. 2022).
Therefore, just as in Morgan, class certification is not appropriate because “ ’the facts underlying the claims of the purported class[es] are too diverse’ and the causal connection between” Commerce’s “allegedly unfair practice[s] and any loss ‘is not just difficult to identify but appears to vary widely depending on the [insured].’ ” Morgan, 91 Mass. App. Ct. at 7, quoting Kwaak v. Pfizer, Inc., 71 Mass. App. Ct. 293, 294 (2008) (reversing class certification of a plaintiff class seeking to challenging advertising of Listerine mouthwash).[5]
4.2. Individual Questions Predominate. Because the issue of liability requires individualized proof and cannot be decided on a class wide basis, the Court finds and concludes that common issues do not predominate over individual ones, a class action is not superior to individual adjudication of claims, and denial of class certification is appropriate. See Fletcher, 394 Mass. at 603–604 (affirming denial of class certification); accord Moelis, 451 Mass. at 490 (affirming denial of class certification for c. 93A claim because individualized
 
--------------------------------------------
 
[5] Parsons’ reliance on Aspinall is misplaced. The claims in this case have nothing to do with the Aspinall allegations that a cigarette manufacture duped a large class of consumers into ingesting a product likely to cause lung cancer and other diseases through deceptive advertising that suggested some variants of the product (“light” and “low tar” cigarettes) were safer or “less unhealthful.” Contrast Aspinall, 442 Mass. at 396–397. “[T]he plaintiffs in that case argued that all purchasers of the ‘light’ cigarettes” suffered a similar injury because they “paid more than the ‘true market value’ of the cigarettes, i.e., what they would have paid had they known the true characteristics of the product.” Kwaak, 71 Mass. App. Ct. at 298–299 (distinguishing Aspinall).
 
                                                            -8-
 
inquiry was needed to resolve statute of limitations defense);  Lara,  25 F.4th  at 1139.
Class certification under c. 93A is not appropriate where, as here, it is quite possible that many members of the proposed class have suffered no injury. See Bellermann I, 470 Mass. at 54–59 (affirming denial of class certification). The Court recognizes that Parsons “need not prove that every member of the proposed class has been harmed before the class can be certified.” Gammella v. P.F. Chang’s China Bistro, Inc., 482 Mass. 1, 14 (2019), quoting Bell v. PNC Bank, Nat’l Ass’n, 800 F.3d 360, 380 (7th Cri. 2015). Parsons is not even required “to demonstrate that the number of uninjured class members [is] ‘de minimis.’ ” Salvas, 452 Mass. at 370–372. But here there is no way to determine whether class members have suffered any injury at all without deciding on an individualized basis whether they received or were offered a price that fell below any reasonable estimate of the ACV of their damaged vehicle. Class certification is therefore not appropriate. See Morgan, 91 Mass. App. Ct. at 7.
Courts in other jurisdictions have reached the same conclusion as in Morgan and have denied class certification in similar suits challenging an insurer’s use of CCC’s reports to estimate the ACV of damaged motor vehicles for essentially the same reason. See Sampson v. United Services Auto. Assn., 83 F.4th 414, 422 (5th Cir. 2023) (vacating class certification); Lara, 25 F.4th at 1139 (affirming denial of class certification); Signor v. Safeco Ins. Co. of Illinois, no. 19-61937-CIV, 2021 WL 1348414, at *8–*11 (S.D. Fla. Feb. 18, 2021) (denying class certification), aff’d, 72 F.4th 1123 (11th Cir. 2023).
4.3. Not Merely a Question of Damages. Parsons contends that the issue of which class members suffered injury raises only a question of damages, can be addressed later on, and should not preclude  class  certification.  Cf.  Weld,  434 Mass. at 92 (need for individualized assessment of damages “does not preclude class certification where all other requirements are met”).
The Court disagrees. There is a difference between determining the extent of harm (the question of damages) and deciding whether there was any harm at all (which goes to liability). “While obstacles to calculating damages may not preclude class certification, the putative class must first demonstrate economic loss on a common basis.” Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 189 (3d Cir. 2001).
 
                                                            -9-
 
Proof of legally cognizable harm or injury is a necessary element of any claim under G.L. c. 93A. See Bellermann v. Fitchburg Gas & Elec. Light Co., 475 Mass. 67, 73 (2016) (“Bellermann II”); Tyler v. Michaels Stores, Inc., 464 Mass. 492, 501–503 (2013); Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc., 445 Mass. 790, 800–802 (2006). “[T]o meet the injury requirement under G.L. c.  93A,  § 9(1)  or 11, a plaintiff must have suffered a ‘separate, identifiable harm arising from the [regulatory] violation’ that is distinct ‘from the claimed unfair or deceptive conduct itself.’ ” Bellermann II, supra, quoting Tyler, supra.
A consumer is not entitled to collect even nominal, statutory damages under c. 93A without proving that the violation caused a “separate” and “distinct” injury. Tyler, 464 Mass. at 502–503; accord Karaa v. Kuk Yim, 86 Mass. App. Ct. 714, 725 (2014). In enacting c. 93A, “the Legislature … did not intend to confer on plaintiffs who have suffered no harm the right to receive a nominal damage award which will in turn entitle them to a sometimes significant attorney’s fee recovery.” Aspinall, 442 Mass. at 401, quoting Lord v. Commercial Union Ins. Co., 60 Mass. App. Ct. 309, 321–322 (2004). A plaintiff asserting a c. 93A claim based on allegedly unfair insurance claims settlement practices must therefore “prove that the defendant’s unfair or deceptive act caused an adverse consequence or loss.” Rhodes v. AIG Domestic Claims, Inc., 461 Mass. 486, 496 (2012).
If an allegedly unfair or deceptive act or practice did not injure proposed class members, then “their claims must fail for lack of  causation.”  Bellermann  I, 470 Mass. at 55. In other words, “if there's no injury, then the … unfair trade practices claims must fail. That's not a damages issue; that's a merits issue.” Sampson, 83 F.4th at 422, quoting Lara, 25 F.4th at 1139. The need in this case for an individualized inquiry to resolve such issues would involve much more than “merely a question of damages,” and makes it appropriate to deny class certification. See Bellermann I, supra.
ORDER
Plaintiff’s motion for class certification is denied. The session clerk shall schedule a Rule 16 conference to discuss setting a final schedule for resolving Plaintiff’s individual claims.