SHERRY KWAAK & another[1] vs. PFIZER, INC.

No. 07-P-317.

Middlesex. December 17, 2007. - February 29, 2008.

Present: COWIN, BROWN, & KAFKER, JJ.

*Advertising. Practice, Civil,* Class action. *Consumer Protection Act,* Class action, Unfair or deceptive act. *Rules of Civil Procedure.*

Discussion of the standards for class certification pursuant to Mass.R.Civ.P. 23 and G. L. c. 93A, § 9(2). [297-298]
In the circumstances of a civil action where the plaintiffs sought certification as a class of Massachusetts users of a particular brand of mouthwash who purchased that product during a certain allegedly deceptive advertising campaign, the Superior Court judge abused his discretion in concluding that the certified class consisted of consumers similarly situated and similarly injured by a common deceptive act or practice for purposes of G. L. c. 93A, § 9(2) [298-302], and that the class met the more stringent standard for certification under Mass.R.Civ.P. 23 [302]. BROWN, J., concurring.

CIVIL ACTIONS commenced in the Superior Court Department on January 13, 2005, and February 11, 2005, respectively.

A motion for class certification was heard by *Isaac Borenstein*, J.

A proceeding for interlocutory review was heard in the Appeals Court by *Graham*, J.

*Thomas A. Smart*, of New York (*Richard A. De Sevo*, of New York, with him) for the defendant.

*Kenneth D. Quat* (*David Pastor* with him) for the plaintiffs.

*Ben Robbins, Martin J. Newhouse, & Jo Ann Shotwell Kaplan*, for New England Legal Foundation, amicus curiae, submitted a brief.

KAFKER, J. Sherry Kwaak and Jerry Natale, by separate complaints filed in Superior Court, sued Pfizer, Inc. (Pfizer), the

---

[1] Jerry Natale, on behalf of themselves and all others similarly situated.

manufacturer of Listerine brand mouthwash (Listerine), alleging that a Listerine advertising campaign that claimed that Listerine was "as effective as floss" was deceptive, violated G. L. c. 93A, § 2, and thus caused them and others similarly situated economic injury. The plaintiffs sought certification of a class of all Massachusetts consumers who purchased Listerine during the advertising campaign. A Superior Court judge allowed a motion for class certification under both Mass.R.Civ.P. 23, 365 Mass. 767 (1974) (rule 23), and G. L. c. 93A, § 9(2), and Pfizer filed an interlocutory appeal. Because the facts underlying the claims of the purported class are too diverse, we reverse the order of the Superior Court granting class certification.

1. *Background.* In June, 2004, Pfizer began an advertising campaign for Listerine. The advertisements were targeted primarily at nonmouthwash users actively involved in their health care who "know that they should floss on a regular basis — but don't always get to it or do it properly." Secondary targets were current users of Listerine who "embrace the brand and could be encouraged to use it more frequently based on the new claim" that it was as effective as floss.

The new claim arose out of two clinical studies conducted by Pfizer: the Sharma Study, published in the American Journal of Dentistry in 2002, and the Bauroth Study, published in the Journal of the American Dental Association in 2003. As summarized by the Sharma Study, "twice-daily rinsing with [Listerine] is 'at least as good as' daily flossing in controlling interproximal gingivitis when both are used unsupervised over a 6-month period."[2] The studies provided "additional support for the use of [Listerine] as an adjunct to [flossing]." Neither study suggested that "mouthrinse should be used instead of dental floss or any other interproximal cleaning device." The studies also did not compare the benefits provided by Listerine and flossing to those persons with severe gingivitis or periodontitis. The studies recognized that the effectiveness of flossing was apparently dependent on "flossing technique," as many people do not floss correctly. An estimated eighty-seven percent of consumers floss infrequently or do not floss at all.

---

[2] "Interproximal" refers to the space between adjoining teeth.

The advertising campaign included four different television advertisements, print advertising, and labels and tags attached to some bottles of Listerine. Despite some internal disagreement, the American Dental Association approved the advertising. *McNeil-PPC, Inc.* v. *Pfizer, Inc.*, 351 F. Supp. 2d 226, 241 (S.D.N.Y. 2005). The first television advertisements, which were produced in several different versions, claimed that "Listerine's as effective as floss," and "[s]o even if you don't floss like you should, now you can get healthy benefits by simply rinsing." Later versions of the television advertisements added to the statement that "Listerine's as effective as floss in fighting plaque" the caveat "[a]gainst plaque and gingivitis between teeth."[3] Later versions also told consumers to "floss daily" and "ask your dentist" and informed consumers that "there's no replacement for floss" or "not a replacement for floss." In its first month or so of television advertising, an estimated sixty-eight million people nationwide had seen the commercials. In Massachusetts, Pfizer aired the advertisements at various times on network, syndicated, and cable television.

The print and bottle label advertisements included the statement, "Only Listerine Antiseptic is clinically proven to be as effective as floss," continuing (in smaller print), "at reducing plaque and gingivitis between the teeth." Later advertisements added the statements "ask your dentist," "floss daily," and "not a replacement for floss."

Pfizer attached some form of label or neck tag making the "as effective as floss" claim to at least some bottles of their Listerine products, while other bottles were never given neck tags or labels making the "as effective as floss" claim. When a dental floss manufacturer sued Pfizer, alleging that the advertisements violated the Lanham Act, 15 U.S.C. 1125(a) (2000) (prohibiting false advertising), a judge of the Federal District Court issued a preliminary injunction preventing Pfizer from continuing the advertising campaign. *McNeil-PPC, Inc.* v. *Pfizer, Inc.*, 351 F. Supp. 2d at 256-257. Pfizer later agreed to stop the campaign completely. The proposed class period, from

---

[3]Plaque is "a film of mucus harboring bacteria" that can lead to cavities on the teeth and to gingivitis, "an inflammation of the [gum] tissue." Webster's Third New Intl. Dictionary 958, 1732 (1993).

June 1, 2004, to April 27, 2005, corresponds with the length of Pfizer's advertising campaign. Its television advertisements making the "as effective as floss" claim stopped on January 8, 2005. Sales of Listerine were estimated to increase ten percent during the advertising campaign. During the proposed class period, the price of Listerine varied throughout the Commonwealth, and from State to State.

Kwaak and Natale, the putative class representatives in this case, both had used Listerine for at least ten years before the advertising campaign. Kwaak bought Listerine and other mouth rinses to freshen her breath and clean her mouth, and Natale bought Listerine to fight plaque and gingivitis and to freshen his breath. Both continued to purchase Listerine during the class period, and Natale has purchased Listerine since commencing this lawsuit. Kwaak switched to less expensive generic brands of mouthwash when the wife of her lawyer informed her that Listerine "wasn't doing what it stated it was." The plaintiffs do not seek damages based on a negative impact on their health. Instead, they argue that Pfizer's deceptive advertising gave Listerine "an actual value at the time of purchase less than the value paid for the product."

Kwaak and Natale testified to seeing television commercials, but not print advertisements, bottle labels, or neck tags. Neither could remember the specific television commercials they saw. Essentially all they remember from the commercials is that Listerine was described as being as effective as floss. Neither testified that the commercials expressly stated that they should stop flossing. In fact, both continued to floss after seeing the commercials, although Natale testified that he did so less frequently. Kwaak testified to buying more Listerine than before she saw the commercials because she thought it could replace flossing, while Natale did not increase his usage. Neither could remember much of anything about the price they paid for Listerine.

In her pleadings, Kwaak referred to surveys done to calculate the impact of Pfizer's advertisements on the perception of consumers. Kwaak alleged that "31% of those who saw the commercial and 26% of those who viewed the shoulder label took away a replacement message."

A Superior Court judge allowed Kwaak's motion to con-

solidate her case with that of Natale. Relying on *Aspinall* v. *Philip Morris Cos.*, 442 Mass. 381, 397 (2004) (*Aspinall*), another judge allowed the plaintiffs' motion for class certification under both rule 23 and G. L. c. 93A, § 9(2). A single justice of this court granted Pfizer's petition for review of that certification order by a full panel of this court, and Pfizer filed its notice of appeal.

2. *Discussion.* The motion judge granted class certification on the grounds that the plaintiffs met the requirements of both rule 23 and G. L. c. 93A, § 9(2), and so we analyze this case under both sets of requirements.

On a motion for class certification pursuant to either rule 23 or G. L. c. 93A, § 9(2), "[t]he plaintiffs bear the burden of providing information sufficient to enable the motion judge to form a *reasonable judgment* that the class meets the requirements of rule 23 [and c.93A § 9(2)]; they do not bear the burden of producing evidence sufficient to prove that the requirements have been met" (emphasis added). *Weld* v. *Glaxo Wellcome Inc.*, 434 Mass. 81, 87 (2001). The standard of review of that judgment is abuse of discretion, although as explained below, that discretion has been described somewhat differently for the two different types of class certifications. See *id.* at 84-85 ("[t]he decision to grant or deny class status under rule 23 is within the broad discretion of the motion judge"); *Aspinall*, 442 Mass. at 391-392, quoting from *Fletcher* v. *Cape Cod Gas Co.*, 394 Mass. 595, 605-606 (1985) ("A judge possesses 'a degree of discretion' in this matter, but when the judge is deciding a certification request under [G. L. c. 93A] § 9(2), the judge must bear in mind 'a pressing need for an effective private remedy for consumers' ").

Under rule 23(a), a class may be certified "only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." In addition, the court must find that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a

class action is superior to other available methods for the fair and efficient adjudication of the controversy." Mass.R.Civ.P. 23(b).

Under G. L. c. 93A, § 9(2), inserted by St. 1969, c. 690, a plaintiff may bring a class action on behalf of him or herself and other similarly situated parties, "if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons." The c. 93A class certification standard has a more "mandatory tone" than rule 23, *Fletcher* v. *Cape Cod Gas Co.,* 394 Mass. at 605, as the statute lacks the additional predominance and superiority requirements found in the rule. See *Baldassari* v. *Public Fin. Trust,* 369 Mass. 33, 39-40 (1975). That is to say, a certification that fails under c. 93A would fail under the requirements of rule 23 as well. See *Ciardi* v. *F. Hoffman-LaRoche, Ltd.,* 436 Mass. 53, 62 n.17 (2002). Thus, we look first to c. 93A class certification.

a. *Chapter 93A class certification.* This case falters on the first of the G. L. c. 93A requirements: that the use of an unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated. To establish that this is the case, plaintiffs rely heavily on *Aspinall,* 442 Mass. 381. There the Supreme Judicial Court upheld class certification in a case where the defendant cigarette manufacturer had included the label "Marlboro Lights" and the claim "lowered tar and nicotine" on the packaging of its "light" cigarettes. *Id.* at 388. However, the cigarettes had been deceptively designed so that while the cigarettes registered lowered tar and nicotine intake under tests by the Federal Trade Commission, most smokers inhaled just as much of those substances as they would have had they smoked regular cigarettes. *Id.* at 386-388.

In *Aspinall,* the court held that class certification was appropriate when the damages sought were economic rather than health-related. Specifically, the plaintiffs in that case argued that all purchasers of the "light" cigarettes paid more than the "true market value" of the cigarettes, i.e., what they would have paid

had they known the true characteristics of the product. *Id.* at 399-400.[4]

Similarly, a class of tenants was held to have suffered an injury within the meaning of G. L. c. 93A where a landlord presented its tenants with a standard lease that included deceptive and illegal terms regarding the implied warranty of habitability. *Leardi* v. *Brown*, 394 Mass. 151 (1985) (*Leardi*). The leases contained a provision that advised tenants that there was no implied warranty that the premises were fit for human occupation, even though such a representation was contrary to Supreme Judicial Court precedent that held "in a rental of any premises for dwelling purposes . . . there is an implied warranty that the premises are fit for human occupation" and this warranty "cannot be waived." *Id.* at 156, quoting from *Boston Hous. Authy.* v. *Hemingway*, 363 Mass. 184, 199 (1973). The injury existed even though the plaintiffs had not read the illegal lease provisions, on the theory that the term "injury," as used in c. 93A, included "the invasion of any legally protected interest of another." *Id.* at 159, quoting Restatement (Second) of Torts § 7 comment a (1965).[5] As further explained in *Hershenow* v. *Enterprise Rent-A-Car Co. of Boston, Inc.*, 445 Mass. 790, 800 (2006), "confronted by unhabitable conditions, the illegal lease terms would deter tenants from exercising their legal rights."

Here, the plaintiffs argue that the motion judge correctly found that the members of the prospective class were subject to a "similar injury" as required under G. L. c. 93A, § 9(2). The motion judge found that, as in *Aspinall, supra,* the plaintiffs had met their burden, for class certification purposes, of showing that the Listerine advertising campaign was deceptive and had caused economic injury to the plaintiffs, i.e., the "difference between the advertised value and the actual value of Listerine due to Pfizer's false advertising."

This case differs from *Aspinall* and *Leardi* in important respects. In both *Aspinall* and *Leardi*, there was information

---

[4]"Whether plaintiffs ultimately will be successful in proving actual damages is a matter that need not be resolved at the certification stage." *Aspinall,* 442 Mass. at 400.

[5]The court describes this as a close question. *Leardi,* 394 Mass. at 159. See *Hershenow* v. *Enterprise Rent-A-Car Co. of Boston, Inc.,* 445 Mass. 790, 800 & n.20 (2006).

sufficient for a reasonable judgment to be made that the members of each class had been directly presented with the same significant, deceptive information. In *Aspinall*, 442 Mass. at 392-393, every package of Marlboro Lights had been labeled "lowered tar and nicotine," when, as smoked, they were not lower in those substances for the vast majority of users, and the standard leases presented to the tenants in *Leardi*, 394 Mass. at 156-157, sought to negate the important implied warranty of habitability, when they could not as matter of law. See *Weld* v. *Glaxo & Wellcome Inc.*, 434 Mass. at 89 (class representative and "every member of the certified class were CVS pharmacy customers whose prescription drug profiles were scanned . . . without their knowledge or consent, which scanning resulted in a letter being sent"). Each of the plaintiffs in *Aspinall* received the same, essential misinformation. Although reliance on the information was not deemed necessary, the required causal connection between the deception and the loss was found to be present. Light cigarette purchasers were paying for cigarettes that were marketed as light, lowered tar and nicotine cigarettes but were not. *Aspinall*, *supra* at 396-397. Similarly, all of the tenants in *Leardi*, *supra*, were given standard leases with illegal provisions that could, if disputes arose, be reasonably interpreted to mislead them about their rights.

In this case, there is insufficient information in the record to identify any such similarity of exposure, deception, and causation. The class certified is everyone who purchased Listerine products during the advertising campaign, regardless whether a purchaser was exposed to the campaign. Unlike in *Aspinall*, not every product was mislabeled. Some Listerine products, for example, contained no label or tag connected to the advertising campaign.[6] Moreover, the advertising campaign also changed substantially over time, moving, for example, from advertisements that may have improperly conveyed a floss-replacement message (the most obviously objectionable aspect of the campaign) to advertisements that expressly did not. Therefore, many of those exposed to the advertising campaign may not have been exposed to unfair or deceptive acts as defined by G. L. c. 93A.[7] In

---

[6]Some of these purchasers would, however, have been exposed to the television or print advertising.

[7]"[A]n advertisement is deceptive when it has the capacity to mislead

analyzing these false advertising claims, the court will be forced to draw fine lines between actionable deception and permissible puffery. Also unclear is whether those exposed to the deceptive aspects of the advertising campaign purchased Listerine for reasons unrelated to the advertising, such as to freshen their breath or as an adjunct to flossing. Compare *Aspinall, supra* at 394 (deceptive advertising of cigarettes as light, with lowered tar and nicotine, could reasonably be found to have caused smokers, interested in purchasing light, lowered tar and nicotine cigarettes to purchase Marlboro Lights). Whether a causal connection exists between a deceptive act and a loss is not just difficult to identify but appears to vary widely depending on the customer.

The class proposed to be certified therefore includes some consumers with exposure and some without exposure to a variety of different advertisements, some deceptive, for at least a category of consumers, and others adequately informative for any reasonable consumer. The class would include those who purchased the product for reasons related to the deceptive aspects of the advertising and those who purchased it for reasons totally unrelated. In these circumstances, it is difficult to conclude that the class certified consists of consumers similarly situated and similarly injured by a common deceptive act or practice.

Such differences also cannot be bridged simply by arguing that the deceptive aspects of the marketing campaign somehow raised the value of the product for all purchasers of the product. This is a consumer and not a securities fraud case, so we do not assume "a nearly perfect market in information." *Peil* v. *Speiser*, 806 F.2d 1154, 1161 n.10 (3d Cir. 1986). See *Summit Properties Inc.* v. *Hoechst Celanese Corp.*, 214 F.3d 556, 561 (5th Cir. 2000) (distinguishing securities market); *Sikes* v. *Teleline, Inc.*, 281 F.3d 1350, 1363 (11th Cir. 2002) ("[t]he securities market presents a wholly different context than a consumer fraud case"). There were also too many different reasons why consumers purchased these particular products, too many different types of advertisements, too much variation in exposure to the advertise-

consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (i.e., to entice a reasonable consumer to purchase the product)." *Aspinall*, 442 Mass. at 396.

ments, too fine a line between permissible puffery and action-able deception in the different advertisements, and too little information on the market impact of the deceptive aspects of the advertising campaign to support a conclusion that the consum-ers in the class certified were similarly situated and similarly injured by a common deceptive act or practice.[8]

b. *Rule 23 class certification.* As discussed *supra,* the standard for class certification under rule 23 is more stringent than that under c. 93A. For the reasons previously detailed, we conclude that the judge also abused his discretion in certifying the class under rule 23. Our decision is also in line with other States that have considered and rejected class certification for claims arising out of the "effective as floss" advertising campaign. See *Whalen* v. *Pfizer, Inc.,* 9 Misc. 3d 1124A (N.Y. County Sup. Ct. 2005); *Elder* v. *Pfizer, Inc.,* 222 Ill. 2d 570 (Cir. Ct. Ill. Feb. 17, 2006).

3. *Conclusion.* The trial judge erred as matter of law in certify-ing the class under both G. L. c. 93A, § 9(2), and rule 23. The order certifying the class is therefore vacated and the case is remanded for further proceedings consistent with this decision.

*So ordered.*

BROWN, J. (concurring). I fully agree with the carefully crafted

---

[8]We note that we have not decided that no class could have been certified in the instant case. Whether the plaintiffs may, with additional submissions, be able to identify a similarly situated class of consumers who have been exposed to actionable deception in the "effective as floss campaign," and suffered an economic loss because of it, remains unclear. See generally *Aspinall,* 442 Mass. at 398 n.22, quoting from *School Comm. of Brockton* v. *Massachusetts Commn. Against Discrimination,* 423 Mass. 7, 14 n.12 (1996) ("decision as to class certification is not immutable"); *DiCerbo* v. *Commissioner of Dept. of Employ-ment & Training,* 54 Mass. App. Ct. 128, 131 (2002) (new classes certified after remand). See also *General Tel. Co. of the Southwest* v. *Falcon,* 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation"); *Rich-ardson* v. *Byrd,* 709 F.2d 1016, 1019 (5th Cir. 1983) ("Under Rule 23 the district court is charged with the duty of monitoring its class decisions in light of the evidentiary development of the case. The district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts"); *Pabon* v. *McIntosh,* 546 F. Supp. 1328, 1332 (E.D. Pa. 1982) (overbroad class must be redefined). Carving such a class out of the undifferentiated mass of consumers of Listerine here, however, requires much more preparatory work on the part of the plaintiffs to allow the trial judge to make a reasonable judgment regarding such certification.

majority opinion. However, I have much less difficulty conclud-
ing that the certification of the class here was improper. The
interests of the various potential plaintiffs are so dissimilar that I
am puzzled why these plaintiffs' counsel have diverted their ef-
forts away from a problematic case to an extremely difficult one
that attempts to encompass the much larger universe of a class
action.

An attorney's paramount interest is that of his or her client.
See Mass.R.Prof.C. 1.7, as amended, 430 Mass. 1301 (1999).
This familiar standard has, of course, been expressed in differ-
ent ways over the past two millennia, from the Bible, see Mat-
thew 6:24 ("No man can serve two masters"), to the quaint old
proverb that "you dance with the one who brought you."